IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SUSAN E. ALVESTEFFER,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>　　　　　Defendant. | MEMORANDUM DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION<br><br>Case No: 1:07-CV-171 DN<br><br>Magistrate Judge David Nuffer |

　　　　Plaintiff Susan Alvesteffer seeks review of the Commissioner's decision denying her claims for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.[1] This case is before the magistrate judge with consent of the parties pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.[2]

　　　　Alvesteffer applied for DIB and SSI on February 22, 2004, alleging disability since June 15, 2003, due to depression, anxiety, damage to the right elbow, and arthritis.[3] After her claims were denied initially and on reconsideration, Alvesteffer requested a hearing before an administrative law judge (ALJ), and hearings were held on January 12, 2007, and April 17, 2007.[4] In a decision dated May 23, 2007, the ALJ denied the claims, finding she could perform

---

[1] 42 U.S.C. §§ 401-433, 1381-1383f.

[2] Consent and Order, docket no. 16, filed 12/5/08.

[3] R. 92-94, 113, 309-12.

[4] R. 32-44, 313-64.

a reduced range of sedentary work.[5] The Appeals Council denied the request for review,[6] making the ALJ's decision the Commissioner's final decision for purposes of judicial review before this court.[7]

## BACKGROUND AND MEDICAL HISTORY

Alvesteffer was 47 years old on the date of the ALJ's decision.[8] She has one year of college education and worked as a legal secretary in Wyoming until 2003.[9] In 2003, she left her job in Wyoming and moved to Ogden, Utah after a divorce and a series of personal family issues left her depressed and suicidal.[10]

### Mental-Health Treatment and Evaluations

Alvesteffer saw Mark Sanders, a certified physician assistant (PA-C) in Wyoming, for treatment for depression between February 2001 and October 2002.[11] Sander's records reflect diagnoses of depression, bipolar disorder, and cyclothymia, and prescriptions for Paxil, Neurontin, Depakote, Celebrex, Nortriptyline, Lexapro, Xanax, Skelaxin, and Ultracet.[12]

Alvesteffer also received treatment for depression and anxiety at Weber Human Services

---

[5] R. 10-31.

[6] R. 3-5.

[7] *See* 20 C.F.R. § 416.981.

[8] R. 92.

[9] R. 114-19.

[10] R. 326-27.

[11] R. 133-40.

[12] *Id*.

between March 2004 and June 2005.[13]  She began treatment seeking medication for depression and anxiety.[14]  Clarke Summers, M.D., prescribed Wellbutrin after diagnosing depression-major and recurrent, possible passive dependency, and GAF[15] codes of 51 (current) and 55 (highest in last year).[16]  Medication was changed to Ativan and Effexor after Alvesteffer complained that Wellbutrin was ineffective,[17] and Nortriptyline and Neurontin were later added to her treatment regimen.[18]  The complete records from Weber Human Services indicate diagnoses of generalized anxiety disorder, panic disorder with agoraphobia, sexual abuse of adult, and insomnia, with GAF codes ranging from 45[19] to 55.[20]

In November 2004, Alvesteffer's prescription for Neurontin was refilled at the Ogden Clinic.[21]  At that time, she felt that she was improving on Neurontin and denied any suicidal ideation, fearfulness, hopelessness, mood swings, agitation, obsessive thoughts, and

---

[13] R. 141-234.

[14] R. 200.

[15] A Global Assessment of Functioning (GAF) code between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV)*, 32 (4th ed. 1994).

[16] R. 200-01.

[17] R. 165-73

[18] R. 155.

[19] A GAF code between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 32.

[20] R. 147-220.

[21] R. 253.

hallucinations.[22]

At the Commissioner's request, Alvesteffer completed a consultative mental status examination with Elizabeth Allen, Ph.D. in February 2005.[23] Dr. Allen found Alvesteffer had average general knowledge, low-average concentration and attention, good-to-average memory, and coherent, age-appropriate speech.[24] She concluded that Plaintiff's attention and concentration were within normal limits, and that she could understand, remember, and carry out simple instructions.[25] Dr. Allen diagnosed generalized anxiety disorder, major depressive disorder -recurrent and moderate, moderate relational problem, and a current GAF of 55-60.[26]

A State agency psychologist completed Psychiatric Review Technique Form[27] for Alvesteffer in May 2005 and found she had affective and anxiety-related disorders, which caused moderate limitations in concentration and mild limitations in activities of daily living and social functioning.[28] In a Mental Residual Functional Capacity Assessment,[29] the psychologist found no significant limitations in most areas of work-related mental functioning, and moderate limitations in the following areas: understanding, remembering, and carrying out detailed instructions;

---

[22]*Id.*

[23]R. 235-39.

[24]R. 237.

[25]R. 238.

[26]R. 239.

[27]R. 276-89.

[28]R. 286.

[29]R. 291-94.

maintaining attention and concentration for extended periods; and setting realistic goals/planning independently.[30] The psychologist concluded that Plaintiff was capable of following "2-3 step instructions in a low-stress setting."[31]

## Medical Treatment and Evaluations

While being treated by Sanders in Wyoming, Alvesteffer complained of knee and shoulder pain in June 2001,[32] and arthritis in her neck in December 2001.[33] Sanders also prescribed medication for tension headaches in April 2002.[34]

Alvesteffer went to the Ogden Clinic for treatment on various complaints between December 2003 and February 2005.[35] Most of the complaints related to neck, elbow and knee pain. An examination in October 2004 found no abnormalities except for tenderness in the neck and trapezius muscles and Skelaxin was prescribed for acute cervicalgia (neck pain).[36]

In 2004, Alvesteffer sought treatment in a hospital emergency room for knee pain in February and neck pain and headache in November.[37] For the knee pain, Dr. David Drury performed an exam and ordered x-rays. Although there was some mild tenderness upon

---

[30] R. 291-92.

[31] R. 294.

[32] R. 139.

[33] R. 136.

[34] R. 135.

[35] R. 244-60.

[36] R. 256.

[37] R. 271-73.

examination, the x-rays revealed no injury and the patient was discharged with over-the-counter pain medication.[38] Regarding the neck pain, an examination revealed no abnormalities other than tenderness in the neck and trapezius muscle and David Carlquist, M.D., prescribed Lortab for the tension headache.[39]

Ryan Nelson, M.D., examined Alvesteffer at the Commissioner's request in April 2005.[40] He found she had "mild, if any, curvature of the spine," unaccompanied by symptoms, and minimal evidence of any arthritis.[41] Dr. Nelson concluded that "from a physical standpoint this is a relatively fit 45-year-old who should have no problems performing any work appropriate for her age and gender."[42]

On May 9, 2005, Alvesteffer went to the Ogden Clinic with complaints of back pain and headaches.[43] She said she had a 23-year history of mid-back pain and complained of muscle spasms in her back after lifting a child into a swing that morning, and "blinding, debilitating" headaches occurring twice a week.[44] With the exception of tenderness in the neck and trapezius muscles, her examination and x-rays of her neck were normal.[45] C. Mark Adler, M.D., prescribed

---

[38]R. 273.

[39]R. 271.

[40]R. 240-43.

[41]R. 243.

[42]*Id.*

[43]R. 245.

[44]*Id.*

[45]R. 246-47.

Skelaxin for tension headache and cervicalgia.[46]

In June 2005, Alvesteffer sought emergency room treatment for a migraine headache because Stadol, prescribed the day before, had been ineffective.[47] G. Neil Stagg, M.D., diagnosed tension headache and administered Dilaudid and Phenergan.[48]

In July 2005, state agency physician Samuel Taggart, M.D., reviewed Alvesteffer's medical records and concluded that she did not have any severe physical impairment.[49]

Alvesteffer's MRI scan of her lumbar spine in October 2005, was normal, except for the following "minor" findings: a mild, symmetrical bulging disc at L3/4; and mild, symmetrical bulging, mild-to-moderate facet hypertrophy, and possible degenerative changes at L4/5.[50]

In 2007, Travis Schelling, PA-C, completed a Disabled Person and Physician Disability Certification, indicating that Alvesteffer was expected to be disabled for six months due to arthritis.[51]

## Hearing Testimony

At the hearing on April 17, 2007, Alvesteffer testified that she became unable to work in June 2003 because she was having difficulty coping with her life, had headaches, and was

---

[46] R. 246.

[47] R. 264.

[48] *Id.*

[49] R. 295-96.

[50] R. 298.

[51] R. 297.

suicidal.[52] She explained that, at that time, she was going through a divorce, her son was sent to Iraq, one of her daughters tried to commit suicide, and another daughter became pregnant while in high school.[53] She stated, during that time her thought processes were "pretty much nonexistent" but were "better now," and that she was no longer suicidal.[54] In reviewing the past few years Alvesteffer testified: in 2004, she was able to attend to her personal needs, drive, and shop;[55] in 2005, she moved to her own apartment, and shopped, drove, cleaned, prepared meals, and took care of her dog;[56] and in 2006 she enrolled in school to become a registered nurse, but that her grades were poor because she had difficulty with concentration.[57] She complained that many of the psychiatric medications made her nauseous and she noticed little benefit from their use, with the exception of Nortriptyline which did improve her appetite and sleep, but did not seem to affect her depression.[58] She stated that she could not lift more than 20 pounds, and that she could sit for 30 minutes at a time, stand for 15 minutes at a time, and walk one block.[59]

      The ALJ asked the vocational expert (VE), Kenneth Lister, M.Ed., to consider a person of

---

[52] R. 326-28.

[53] R. 327-28

[54] R. 329, 357.

[55] R. 330-32.

[56] R. 333-35.

[57] R. 336.

[58] R. 339-40.

[59] R. 354-55.

Alvesteffer's age, education, and work experience, who was limited to sedentary, unskilled work with the following restrictions: no bending, stooping, or squatting of significance; lifting no more than 10-20 pounds at a time and no more than 5-10 pounds occasionally; sitting for 30 minutes at a time for a total of six hours, and standing for 15 minutes at a time for a total of two hours in an eight-hour workday; no climbing flights of stairs; and no overhead lifting.[60] Additional restrictions included that the person would be limited to low-stress work, which involved low-production work, no work with the general public, minimal interaction with co-workers and supervisors, and minimal changes in the work setting.[61] The ALJ also stated that the person would be limited to tasks requiring low memory and low concentration, thereby precluding mental computations, spontaneous speaking, sustained reading and writing.[62] Further limitations included that the person would be limited to carrying out simple instructions, needed the option of using memory aides, could not do tasks requiring significant ranges of motion of the neck (such as driving), and had level one-to-two math skills, level one-to-two language skills, and level two-to-three reasoning skills.[63] Lister testified that a person with these limitations could work as a nut sorter,[64] call-out operator,[65] and touch-up screener.[66] He then reduced the number

---

[60] R. 358-59.

[61] R. 359.

[62] R. 359-60.

[63] R. 360.

[64] *DOT* code 521.687-086.

[65] *DOT* code 237.367-014

[66] *DOT* code 726.684-110.

of nut-sorter jobs the person could perform by 50%, the number of call-out operator jobs by 60%, and the number of touch-up screener jobs by 50%.[67] When questioned directly by the ALJ, Lister confirmed that his testimony was consistent with the *Dictionary of Occupational Titles* (*DOT*), except that the *DOT* did not indicate whether those jobs could be performed with a sit/stand option, but that, based on his experience as a job developer and job placement counselor, a person who required a sit/stand option could perform those jobs.[68]

### ALJ's Decision

The ALJ followed the familiar five-step sequential evaluation process in analyzing Alvesteffer's claims.[69] At step one, the ALJ found that Alvesteffer had not engaged in substantial gainful activity since June 15, 2003.[70] At step two, he found that Alvesteffer's "severe" impairments consisted of major depressive disorder and anxiety disorder.[71] At step three, he found that her impairments, individually and in combination, failed to meet or equal the criteria of a listed impairment.[72] After finding Alvesteffer's allegations of total disability, especially her "statements concerning the intensity, duration, and limiting effects of these symptoms [were] not

---

[67]R. 360-61.

[68]R. 361-62.

[69]The Commissioner considers, in sequence: (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. 20 C.F.R. §§ 404.1520, 416.920; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (describing the five-step sequential evaluation process).

[70]R. 12.

[71]*Id.*

[72]R. 18.

entirely credible,"[73] the ALJ determined that she had the residual functional capacity to perform sedentary, unskilled work with specified restrictions, due to the fatigue caused by her mental impairments.[74]  At step four, the ALJ found Alvesteffer could not perform her past relevant work.[75]  At step five, based on VE testimony, he found that she could perform the unskilled, sedentary jobs of nut sorter, call-out operator, and touch-up screener.[76]  Therefore, the ALJ found that Plaintiff was not disabled.[77]

## DISCUSSION

Alvesteffer argues that the ALJ erred by: (1) failing to find that her physical impairments were severe;[78] (2) improperly evaluating her credibility;[79] (3) failing to prove that a significant number of jobs existed that she could perform;[80] and (4) failing to resolve a conflict between the testimony of the VE and the *DOT*.[81]

---

[73]R. 28.

[74]R. 18-19.

[75]R. 28

[76]R. 29.

[77]R. 31.

[78]Alvesteffer's Brief at 11, docket no. 12, filed 10/13/08.

[79]*Id.* at 12.

[80]*Id.* at 14.

[81]*Id.* at 17.

**Physical Impairments**

Alvesteffer argues that the ALJ erred as a matter of law in not finding that her physical impairments were severe.[82] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities.[83] "Basic work activities" means the abilities and aptitudes necessary to do most jobs, examples of which include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.[84] A physical impairment must be established by medical evidence, and must last for a continuous period of at least 12 months.[85] Although Alvesteffer correctly points out that only a "de minimis" showing of impairment is required to establish the existence of a severe impairment,[86] "the claimant must show more than the mere presence of a condition or ailment."[87]

Alvesteffer has failed to identify any medical evidence that might support a finding that

---

[82] Alvesteffer's Brief at 12.

[83] *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997).

[84] 20 C.F.R. §§ 404.1521, 416.921.

[85] 20 C.F.R. § 404.1508

[86] Alvesteffer's Brief at 11 (citing *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005), *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997), and *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).

[87] *Hinkle*, 132 F.3d at 1352.

her ability to perform basic physical work activities was significantly limited.[88] Although there was evidence that Alvesteffer had some minor physical problems,[89] no physician reported that her minor physical impairments would limit her ability to perform basic work activities. All of her examinations, including imaging evaluations, were normal with only mild findings at most. In fact, after a thorough physical examination, Dr. Nelson stated that "from a physical standpoint this is a relatively fit 45-year old who should have no problems performing any work appropriate for her age and gender."[90]

Alvesteffer argues that she must have severe physical impairment since the ALJ included physical limitations in her residual functional capacity. However, the ALJ explained that he considered the limiting effects of all her impairments, even those that were not severe, when he determined her residual functional capacity.[91] This was done properly and in accordance with 20 C.F.R. § 404.1545(e). It appears that, if anything, the ALJ erred in Alvesteffer's favor when he included limitations that were not supported by the medical evidence.

## Credibility

Alvesteffer asserts that the ALJ did not properly assess her credibility and that the "ALJ must explain why specific relevant evidence led him to conclude that the claimant's subjective

---

[88]See *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5 (1987) (stating it is claimant's burden to show she suffers from severe impairment).

[89]R. 242-43, 246, 256, 271, 298 (indicating tenderness in the neck and trapezius muscles and slightly limited flexion in the neck).

[90]R. 243.

[91]R. 19.

complaints were not credible."[92] When reaching the conclusion on Alvesteffer's credibility, the ALJ stated:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.[93]

But, before making this conclusion, the ALJ considered everything that Alvesteffer outlined that he should consider.[94] Specifically he considered: that her clinical evaluations and imaging studies produced normal or, at most, mild findings;[95] the nature of her daily activities;[96] that her mental health providers consistently reported moderate limitations in functioning;[97] and her inconsistent use of medication and failure to follow treatment recommendations.[98]

"Credibility determinations are peculiarly the province of the [ALJ]," and will not be

---

[92] Alvesteffer's Brief at 13 (citing *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)).

[93] R. 28.

[94] R. 26-28. *See Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (listing factors the ALJ may consider in assessing credibility).

[95] R. 27-28. Objective medical findings are relevant in evaluating the severity of subjective complaints. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

[96] R. 27. *See Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995) (stating that daily activities are a relevant factor in assessing the credibility of complaints).

[97] *Id.* Physicians' opinions are an appropriate factor to consider in assessing credibility. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

[98] *Id. See Luna v. Bowen*, 834 F.2d 161, 165-66 (10th Cir. 1987) (stating treatment frequency and use of medication are relevant in evaluating a claimant's credibility).

disturbed if supported by substantial evidence.[99]  Here, the ALJ properly assessed Alvesteffer's credibility when he evaluated her subjective complaints in light of the record as a whole.[100]  The ALJ's credibility determination is entitled to great deference, and will not be disturbed where, as here, it is supported by substantial evidence.[101]

## Significant Number of Jobs in Economy

Alvesteffer argues that the ALJ failed to establish that there are jobs in the national economy that she could perform.  The ALJ relied on the VE's testimony that a person with Alvesteffer's vocational profile and residual functional capacity could perform the jobs of nut-sorter, call-out operator, and touch-up screener, and that 50,000 nut-sorter jobs, 218,000 call-out-operator jobs, and 80,000 touch-up-screener jobs existed in the national economy.[102]  Then the VE reduced the number of nut-sorter jobs by 50%, the call-out operator jobs by 60%, and the touch-up screener jobs by 50% to accommodate Alvesteffer's limitations.[103]  Therefore, the VE provided evidence that there were a sufficient number of jobs  in the national economy that Alvesteffer could perform.

Alvesteffer further asserts that the ALJ did not establish that a significant number of jobs existed because he cited the wrong *DOT*  number for a nut-sorter in the decision.[104]  It is true that

---

[99]*Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (quoting *Kepler,* 68 F.3d at 391 (10th Cir. 1995)).

[100]*Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).

[101]*Kepler*, 68 F.3d at 391.

[102]R. 360-62.

[103]*Id*.

[104]Alvesteffer's Brief at 16.

in the ALJ's decision he listed a nut-sorter, with [DOT code 521.687-026](),[105] and this *DOT* code is actually for a Bunch Trimmer, mold, which is categorized as a light job which Alvesteffer would be unable to perform based on the ALJ's residual functional capacity finding. This error, however, appears to be a typographical error because the VE's testimony, upon which the ALJ relied, correctly lists the *DOT* code for nut-sorter as 521.687-086,[106] and it meets the requirements of Alvesteffer's residual functional capacity as determined by the ALJ.

### Conflict Between the VE's Testimony and *DOT*

Alvesteffer's final argument is that the ALJ erred when he found that she could perform the job of call-out operator even though the *DOT* states that this job requires a GED language level of 3, and the ALJ stated that she had a GED language level of 1-2. The ALJ found that Alvesteffer had *at least* GED levels of 1-2 in language, 1-2 in math, and 2-3 in reasoning.[107] The ALJ was listing the *minimum* requirements at which Alvesteffer was able to perform. In contrast, "[t]he *DOT* lists *maximum* requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."[108] Therefore, it can be assumed that there are some call-out jobs that could be performed by a person having *at least* a level 2 GED in language. Furthermore, the VE specifically reduced the number of call-out operator jobs that Alvesteffer could perform by 60%, indicating that she could not perform all

---

[105] R. 29.

[106] R. 360.

[107] R. 19, 360.

[108] SSR 00-4p (emphasis added).

call-out operator jobs, as described in the *DOT*.  Finally, even if all the call-out jobs were eliminated, the VE still provided evidence of significant number of nut-sorter and touch-up screener jobs in the national economy.[109]

## CONCLUSION AND ORDER

After a complete review of the record, the court finds that ALJ's decision was supported by substantial evidence.  **IT IS HEREBY ORDERED** that the Commissioner's final decision is **AFFIRMED.**

March 30, 2009.

BY THE COURT:

_____
David Nuffer
U.S. Magistrate Judge

---

[109]R. 360-61.